**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:15-CV-00348-FL**

| | | |
|---|---|---|
| MARILYN M. CHISM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| NORTH CAROLINA GENERAL | ) | |
| ASSEMBLY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

NOW COMES Plaintiff, Marilyn M. Chism, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, and files this Amended Complaint against Defendant as a matter of course.

## JURISDICTION AND VENUE

1.      This action is brought to remedy discrimination against Plaintiff on the basis of her race and gender, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended by the Civil Rights Act of 1991 and set forth in 42 U.S.C. §2000e, et seq.

2.      Plaintiff seeks monetary relief, compensatory damages, and reinstatement pursuant to 42 U.S.C. §2000e(g).

3.      On August 26, 2011, Plaintiff filed an Intake Questionnaire with the Equal Employment Opportunity Commission (EEOC) stating that she wanted to file a Charge of Discrimination against the North Carolina General Assembly and that she had been forced to resign on March 18, 2011 while white male comparators were not forced to resign.  (A copy of the EEOC Intake Questionnaire is attached hereto as Exhibit 1.)

4.     On November 25, 2011, Plaintiff signed and filed a verified Charge of Discrimination with the EEOC alleging that she had been discriminated against on the basis of her race and sex when she was forced to resign from the position of Fiscal Research Division Director with the North Carolina General Assembly.  (A copy of the Charge of Discrimination is attached hereto as Exhibit 2.)

5.     On August 5, 2013, the EEOC issued a Determination finding that Plaintiff had been discriminated against on the basis of her race and that it was unable to determine whether she had been discriminated against on the basis of her sex.  (A copy of the Determination is attached hereto as Exhibit 3.)

6.     On September 30, 2013, the EEOC determined that efforts to conciliate the Charge of Discrimination had failed and Plaintiff's case was forwarded to the U.S. Department of Justice for possible litigation or the issuance of a Notice of Right to Sue

7.     On April 21, 2015, the U.S. Department of Justice, Civil Rights Division, Employment Litigation Section, issued to Plaintiff a Notice of Right to Sue. Plaintiff received the Notice of Right to Sue on April 24, 2015.  (A copy of the Notice of Right to Sue is attached hereto as Exhibit 4.)

8.     On July 22, 2015, Plaintiff filed a pro se Complaint against Defendant in this action.

9.     Plaintiff has exhausted all of her administrative remedies and has met all the necessary preconditions to support jurisdiction in this court.

10.     During the administrative process, the EEOC never determined that Plaintiff was subject to the Government Employee Rights Act of 1991, 42 U.S.C. § 2000e-16a, et seq. (GERA), rather than Title VII. Defendant also never contended that Plaintiff was an employee subject to GERA.

2

11.     In the event the Court determines that Plaintiff was not an "employee" under 42 U.S.C. § 2000e(f) of Title VII, the Court should remand this case to the EEOC to allow her discrimination claims to proceed under the provisions of GERA and 29 CFR §1603.101, et seq.

12.     Plaintiff is a citizen and resident of Raleigh, Wake County, North Carolina.

13.     Defendant North Carolina General Assembly is the state legislative branch of North Carolina created pursuant to Article II, Section 1 of the North Carolina Constitution, and can sue and be sued.

14.     Defendant is the former employer of Plaintiff.  Plaintiff performed her job in Wake County, North Carolina.

15.     The jurisdiction of this court is invoked pursuant to 42 U.S.C. §2000e and 28 U.S.C. §1331.

16.     This court has venue over this action under 28 U.S.C. §1391(b).

## PARTIES

17.     Plaintiff is an African-American female who was employed by Defendant.

18.     Plaintiff is a person within the meaning of 42 U.S.C. §2000e(a) and was an employee within the meaning of 42 U.S.C. §2000e(f).

19.     In the alternative, Plaintiff was an exempt State employee covered by 42 U.S.C. § 2000e-16c of GERA.

20.     Defendant is a person within the meaning of 42 U.S.C. §2000e(a) and an employer within the meaning of 42 U.S.C. §2000e(b).

21.     Defendant is the legislature of the State of North Carolina located in Raleigh, Wake County, North Carolina.

22.     Defendant has over 500 employees within its work force.

3

23.     At all times relevant to this Amended Complaint, Plaintiff held the position of Fiscal Research Division Director for the North Carolina General Assembly.

24.     At all times relevant to this Amended Complaint, the following people acted as agents of Defendant and within the course and scope of their agency with respect to the acts complained of herein:

      a.      Speaker of the House of Representatives, Thom Tillis (white, male);

      b.      Chief of Staff to Speaker Tillis, Charles Thomas (white, male);

      c.      General Counsel to Speaker Tillis, Jason Kay (white, male);

      d.      President Pro Tempore ("President") of the Senate, Phil Berger (white, male);

      e.      Chief of Staff to President Berger, Jim Blaine (white, male);

      f.      Legislative Services Officer, George Hall (white, male); and,

      g.      Representative Tim Moore (white, male).

## STATEMENT OF FACTS

25.     Plaintiff is an African-American female.

26.     Plaintiff grew up in Columbus County, North Carolina.

27.     Plaintiff has an undergraduate degree from the University of North Carolina at Greensboro and a law degree from the University of North Carolina at Chapel Hill.

28.     Before attending law school, Plaintiff worked for four years in the State Auditor's office and was licensed as a CPA.

29.     From late 1993 until early 1998, Plaintiff worked as the Internal Auditor and then Director of Scholarships for North Carolina Central University.

30.     On May 8, 1998, Plaintiff began employment with Defendant as a Fiscal Analyst with the Fiscal Research Division of Defendant's Legislative Services Commission.

4

31.     During the first nine years of her employment with the Fiscal Research Division, Plaintiff progressed from a Fiscal Analyst I position to a Principal Fiscal Analyst position.

32.     On or about February 9, 2009, Plaintiff was promoted to Director of the Fiscal Research Division.

33.     The Fiscal Research Division is a non-partisan staff agency of Defendant and is independent of all other officers, agencies, boards, commissions, divisions and other instrumentalities of State government.

34.     The Fiscal Research Division is a non-partisan agency of career employees that provides budget and tax related information and analysis to all members of the North Carolina General Assembly ("General Assembly").

35.     Pursuant to N.C. Gen. Stat. §120-36.3, the functions of the Fiscal Research Division are as follows:

- To make periodic and special analyses of past receipts and expenditures and of current requests and recommendations for appropriations of State departments, agencies, and institutions, giving special consideration to the requests and recommendations for appropriations to continue current programs and services.

- To review and evaluate compliance by State departments, agencies, and institutions with such legislative directions as may be contained in the State budget.

- To examine the structure and organization of State departments, agencies, and institutions and recommend such changes as considerations of increased efficiency might indicate.

5

- To make such other studies, analyses, and inquiries into the affairs of State government as may be directed by the Legislative Services Commission, by the Committee on Appropriations of either house, or by either house of the General Assembly.

- To make periodic reports on the activities of the Division and special reports on the above-mentioned studies, reviews, analyses, evaluations, examinations, and inquiries to the Committee on Appropriations of either house of the General Assembly, or to either house of the General Assembly, as may be appropriate. The reports of the Division shall, where feasible, include estimates of the financial savings achieved by or anticipated to result from its recommendations.

36.     One of the major activities of the Fiscal Research Division is to provide financial analysis of proposed legislation during the budget process.

37.     The staff of the Fiscal Research Division analyzes the Governor's proposed budget and tax recommendations.

38.     The staff of the Fiscal Research Division estimates the costs of proposed legislation for Defendant's legislators.

39.     When the General Assembly is not in session, the staff monitors implementation of the laws by State agencies, tracks spending, and follows major federal policy issues that could affect the State.

40.     The Fiscal Research Division is non-partisan.  The Division is tasked with the job of providing objective analysis on the financial impact of proposed legislation. The Division also reviews and analyzes periodic budget and expenditure reports prepared by the Office of State Control and Office of State Budget & Management to determine the manner in which money has

6

been spent by State agencies.

41.     As Director, Plaintiff had thirty-six analysts reporting to her. The analysts were divided into teams associated with appropriations committee and finance committee structures which align with particular governmental functions:  Natural and Economic Resources, Education, Health and Human Services, Justice and Public Safety, Transportation, General Government, House Budget Development, Senate Budget Development, and Finance.

42.     Plaintiff's job was to manage these teams and perform other administrative tasks.

43.     Plaintiff's job was completely non-partisan.

44.     Plaintiff was not on the "personal staff" of "any person elected to public office" as referenced in 42 U.S.C. §2000e(f).

45.     Plaintiff was not "an appointee on the policy making level" for "any person elected to public office" as referenced in 42 U.S.C. §2000e(f).

46.     Plaintiff was not an "immediate adviser with respect to the exercise of the constitutional or legal powers of the office" for "any person elected to public office" as referenced in 42 U.S.C. §2000e(f).

47.     Plaintiff made sure that the teams of employees reporting to her were adequately staffed, reviewed and approved the fiscal analyses done by the teams, did performance evaluations for her staff, conducted staff meetings, assigned inquiries from members of the General Assembly to her staff, and responded to information requests from the public.

48.     Plaintiff performed her job well and carried out her duties admirably.

49.     Plaintiff always received good performance evaluations and regularly received increases in her pay.

7

50.     As a Director, Plaintiff reported to and was supervised by Legislative Services Officer George Hall.

51.     During her time as Director of the Fiscal Research Division, Plaintiff received two outstanding evaluations from Legislative Services Officer Hall on or about November 3, 2009 and December 13, 2010.

52.     Legislative Services Officer Hall also supervised the following Division Directors:

- Research Division Director Walker Reagan (white, male);

- Bill Drafting Division Director Gerry Cohen (white, male);

- Program Evaluation Division Director John Turcotte (white, male); and,

- Information Systems Division Director Dennis McCarty (white, male).

53.     These Division Directors were also non-partisan career employees.

54.     These Division Directors were not on the personal staff of any person elected to public office as referenced in 42 U.S.C. §2000e(f).

55.     These Division Directors were not appointees on the policy making level for any person elected to public office as referenced in 42 U.S.C. §2000e(f).

56.     These Division Directors were not immediate advisers with respect to the exercise of the constitutional or legal powers of the office for any person elected to public office as referenced in 42 U.S.C. §2000e(f).

57.     In the election of November 2010, the Republican Party won a majority in both the House and the Senate.

58.     The staffs for Speaker Thom Tillis and President Phil Berger immediately began work on legislation that would be introduced in the 2011-12 Session of the General Assembly.

59.    One of the proposed laws under consideration was House Bill 351, entitled "Restore Confidence in Government."  This law required the State's 100 county boards of elections to obtain a state-issued form of identification from voters at the polls and became known as one of the "Voter ID" laws.

60.    Voter ID laws have been controversial on racial grounds in both North Carolina and elsewhere in the country.  These laws have been widely criticized as an attempt to suppress voting by African-Americans because they are less likely to have state-issued forms of identification.

61.    After it was initially passed, HB 351 was vetoed by Governor Beverly Perdue on June 23, 2011 and the General Assembly failed to override the veto.

62.    Similar legislation, House Bill 589 (Voter Information Verification Act/Election Reform), became law on August 12, 2013 as Session Law 2013-381. No African-American legislators in the General Assembly voted in favor of HB 589.

63.     HB 589 is now the subject of a consolidated lawsuit in the Middle District of North Carolina by the North Carolina State Conference of the NAACP, League of Women Voters of North Carolina, the United States of America, and other groups and individuals against the State of North Carolina and various officials. The lawsuits challenge sections of HB 589 on multiple grounds including that passage of the legislation was motivated by a racially discriminatory purpose and that its implementation will have a discriminatory effect on African-Americans.

64.    After they were elected in November 2010, Speaker Tillis, President Berger and their staffs (the above-referenced agents of Defendant) knew that Voter ID legislation was being criticized in the press, by the African-American community, and by the Black Caucus of the General Assembly as being racially discriminatory.

9

65.     In late 2010, Plaintiff's staff was asked to perform a fiscal analysis of the Voter ID law proposed at that time, House Bill 351.

66.     The fiscal analysis of the Voter ID legislation was initially handled by a Fiscal Analyst, Tiesha Pope (black, female), who subsequently resigned from the Fiscal Research Division. It was then completed by another Fiscal Analyst, Mark Bondo (white, male).

67.     On information and belief, Speaker Tillis's staff (the above-referenced agents of Defendant) instructed Fiscal Analyst Bondo to not contact the State agencies that would be affected by the proposed Voter ID legislation, including the State Board of Elections.

68.     This was a very unusual request. As part of their standard fiscal research to prepare an independent objective analysis, Plaintiff's staff routinely contacted the State agencies that would be affected by a proposed piece of legislation to obtain their estimates and data to be considered and analyzed in the preparation of a fiscal analysis.

69.     Fiscal Analyst Bondo followed the instructions given to him and did an estimate of the costs of the proposed Voter ID legislation.

70.     On March 8, 2011, Fiscal Analyst Bondo emailed a confidential fiscal analysis memorandum of the draft Voter ID legislation to select House members with a copy to Plaintiff. In the email Bondo advised that per guidance provided to him, he did not contact State agencies with respect to the bill.

71.     When Plaintiff questioned Fiscal Analyst Bondo about the guidance, Bondo told her that the guidance had come from Speaker Tillis's staff.

72.     Fiscal Analyst Bondo emailed Plaintiff on March 9, 2011 to advise that he needed to talk to her because General Counsel Jason Kay had just called him questioning the fiscal analysis of the Voter ID legislation.

10

73.     When they met, Fiscal Analyst Bondo told Plaintiff that General Counsel Kay thought the estimate of costs for the proposed legislation was high and wanted to know if Plaintiff had seen the analysis. Fiscal Analyst Bondo told Plaintiff that General Counsel Kay appeared to believe that Plaintiff had caused the higher than expected cost estimate.

74.     Plaintiff reviewed the analysis with Fiscal Analyst Bondo and offered suggestions that resulted in lower costs in some instances and in a range of expected costs in others.

75.     On March 10, 2011, one of the sponsors of the draft legislation, Representative Tim Moore (currently, Speaker of the House), emailed Fiscal Analyst Bondo with a copy to Plaintiff about his concerns with the analysis and directed him to examine how Georgia was able to implement a Voter ID law by spending less than a million dollars.

76.     On March 11, 2011, Fiscal Analyst Bondo sent a revised analysis.

77.     On March 14, 2011, Plaintiff responded to the March 10, 2011 email from Representative Moore. In her response, Plaintiff acknowledged Moore's concerns, advised him of the revisions that had been done, informed him that fiscal staff would contact impacted agencies if further requests were made for fiscal analysis of the proposed legislation, and told him why the Fiscal Research Division's independent analysis required such contact.

78.     On information and belief, on March 16, 2011, the Republican Majority Caucus (including Speaker Tillis and Representative Moore) met during its regularly scheduled caucus time.

79.     On March 17, 2011, Chief of Staff for Speaker Tillis, Charles Thomas, General Counsel for Speaker Tillis, Jason Kay, and Chief of Staff for President Berger, Jim Blaine, met with Plaintiff's boss, Legislative Services Officer Hall, and directed him to request Plaintiff's resignation.

11

80. When Legislative Services Officer Hall asked them why she needed to resign, they replied that they had "trust issues" with Plaintiff.

81. Before questions arose over the analysis of the Voter ID bill, Plaintiff had never been told that anyone at the General Assembly, including any of its leaders, had ever had a "trust issue" with her or her work.

82. On March 18, 2011, Legislative Services Officer Hall advised Plaintiff that Defendant's Leadership Staff (Chief of Staff Thomas; General Counsel Kay; and Chief of Staff Blaine) met with him on March 17, 2011 and directed him to request Plaintiff's resignation because they had "trust" issues with Plaintiff.

83. Legislative Services Officer Hall told Plaintiff that he assumed the trust issues were related to the House concerns (which Plaintiff had conveyed to him earlier) with the Fiscal Research Division's fiscal analysis of the draft Voter ID legislation.

84. Legislative Services Officer Hall advised Plaintiff that the House leadership initiated the action to force Plaintiff's resignation and that the Senate did not contest it.

85. Legislative Services Officer Hall told Plaintiff that he asked Chief of Staff Thomas, Chief of Staff Blaine, and General Counsel Kay if Plaintiff could leave her job as Director and transfer to a vacant position in the Division as a Fiscal Analyst. Legislative Services Officer Hall reported to Plaintiff that his request was denied and they said that Defendant's leadership wanted Plaintiff gone.

86. On or about March 21, 2011, Plaintiff met with Speaker Tillis to inquire about where she had fallen short of their expectations because the feedback would be helpful for her professional development.

12

87.     Speaker Tillis told Plaintiff that the request for her resignation was based on the recommendation of his staff based on their interaction with the House Republican Caucus.

88.     On March 21, 2011, Plaintiff requested a similar meeting with President Berger.  A meeting was scheduled for March 22, 2011.

89.     On March 21, 2011, the Office of the State Auditor contacted Plaintiff about a request for a "fast-tracked" audit of the fiscal note process.  This was the process that led to the fiscal analysis of the Voter ID law.

90.     Plaintiff advised her boss, Legislative Services Officer Hall, about the call from the State Auditor's office.  Legislative Services Officer Hall later told Plaintiff that the audit request had come from the office of Speaker Tillis.

91.     On March 21, 2011, Legislative Services Officer Hall advised Plaintiff that Defendant's leadership staff thought that there might be an EEOC concern with Plaintiff's termination.

92.     On March 23, 2011, Plaintiff went to Speaker Tillis's office for an "exit interview" with Speaker Tillis and General Counsel Kay.  During the "exit interview" Speaker Tillis gave new and completely unsupported reasons for her forced resignation.

93.     The March 22, 2011 meeting with President Berger was cancelled by his staff with no explanation to Plaintiff.

94.     On March 23, 2011, Legislative Services Officer Hall advised Plaintiff that Defendant's leadership staff had advised him on March 22, 2011 that they wanted Plaintiff's resignation that day.

95.     On March 23, 2011, Fiscal Analyst Bondo, the white male who worked on the fiscal analysis for the Voter ID legislation, told Plaintiff that General Counsel Kay had called to assure him that he was not going to be fired by Defendant.

13

96.     By March 30, 2011, the Voter ID bill was being hotly debated in the General Assembly. The legislative Black Caucus was strongly opposed to the bill because it adversely affected minority voters.

97.     On March 31, 2011, the News & Observer reported that Defendant's legislative leadership – Speaker Tillis and President Berger - had forced Plaintiff to resign and that Plaintiff was the only woman and only African American to serve as Director for a major legislative division.

98.     On or about April 6, 2011, Legislative Services Officer Hall advised Plaintiff that Chief of Staff Blaine told him that Plaintiff would get one month of severance if she resigned as of April 8, 2011 or else she would be fired.

99.     On April 8, 2011, Plaintiff tendered her resignation, advising that April 8 would be her last day as requested by Speaker Tillis and President Berger.

100.    Plaintiff's resignation was a forced resignation.

101.    If Plaintiff had not resigned, she would have been terminated by Defendant.

102.    Plaintiff was forced to resign by Defendant's leadership because of her race and/or gender.

103.    At the time Plaintiff was forced to resign, Defendant employed five Division Directors including Plaintiff.  Plaintiff was the only African-American Director of a Division.  Plaintiff was the only female Director of a Division.

104.     The other Directors were Walker Reagan (white, male) - Research Division Director; Gerry Cohen (white, male) - Bill Drafting Division Director; John Turcotte (white, male) - Program Evaluation Division Director; and Dennis McCarty (white, male) - Information Systems Division Director.

14

105.     Plaintiff and Program Evaluation Division Director Turcotte were appointed by the Legislative Services Commission pursuant to N. C. Gen. Stat. §§ 120-36.1 and 120-36.11(b), respectively.

106.     Plaintiff and Research Division Director Reagan were appointed to their respective positions at about the same time and were selected via the same process.

107.     Plaintiff, Research Division Director Reagan, Program Evaluation Division Director Turcotte, Bill Drafting Division Director Cohen, and Information Systems Director McCarty were all appointed by and/or serving under the Democratic leadership of the North Carolina General Assembly that was in place prior to the 2011-2012 Session of the General Assembly of North Carolina.

108.     Defendant's Employee Handbook provides that all General Assembly employees serve at the pleasure of the Legislative Services Commission and their employment may be terminated without cause and/or advance notice except that termination of General Assembly employees may not occur due to discrimination prohibited by law.

109.     As of the filing of this Amended Complaint, Turcotte and McCarty continue in their employment as Directors of their respective Divisions.  In August, 2012, Cohen left his position as Bill Drafting Division Director and became Special Counsel to Defendant, a position he held until his retirement in July, 2014. On information and belief, Reagan will retire in December 2015.

110.     Plaintiff was not made aware of any changes by Defendant in her responsibilities (by statute or as practiced) as Director of Fiscal Research Division prior to her termination.

111.     Neither was Plaintiff made aware of any issues with the nature and timeliness of staff's responsiveness to the members except some concern with the fiscal analyses on various drafts of

the Voter ID legislation.

112.     Immediately after Plaintiff's resignation, Defendant appointed Lynn Muchmore (white, male) to serve as Interim Director.

113.     At the time of his appointment as Interim Director, Mr. Muchmore had been serving as a budget advisor to the Chairs of the House Appropriations Committee in a non-paid consulting position for several weeks.

114.     As a consulting budget advisor, Mr. Muchmore had the opportunity to communicate and consult with Plaintiff and the Fiscal Research Division staff and he did do so on several occasions.

115.     In July, 2012, Defendant appointed Mark Trogdon (white, male) to replace Plaintiff as Fiscal Research Division Director.

116.     Plaintiff was at least as well-qualified as Mark Trogdon for the position of Fiscal Research Division Director.

117.     As a result of the unlawful actions of Defendant as set forth herein, Plaintiff has suffered lost wages and benefits, humiliation, loss of reputation and emotional distress.

**FIRST CAUSE OF ACTION: RACE DISCRIMINATION**

118.     Plaintiff incorporates by reference the preceding allegations and makes them a part hereof as if fully set forth herein.

119.     Defendant discriminated against Plaintiff because of her race, African-American, in violation of Title VII of the Civil Rights Act of 1964, as amended, by forcing her to resign from the position of Fiscal Research Division Director and not allowing her the opportunity to transfer to another position at the General Assembly although she had been employed for 13 years and had received several outstanding performance evaluations.

120.    Defendant's decision to force her resignation was because of her race.

121.    Defendant's legislative leadership and their staff wrongly perceived that as an African-American she used her position as Fiscal Research Division Director to inflate the estimated fiscal impact of the proposed Voter ID legislation, that she could not be trusted to properly supervise the financial analysis of the Voter ID legislation, and that she would work too closely with the legislative Black Caucus.

122.    Defendant treated Plaintiff in a disparate manner because of her race by forcing her resignation from the position of Fiscal Research Division Director but not forcing the resignation of any other Directors of the non-partisan Divisions of Defendant's Legislative Services Commission.

123.    The reasons Speaker Tillis offered to Plaintiff for her forced resignation were false and pretextual.

124.    While this matter was pending before the EEOC, Defendant offered other reasons for forcing Plaintiff to resign that were also false and pretextual.

125.    Defendant's race discrimination against Plaintiff was intentional.

**SECOND CAUSE OF ACTION: GENDER DISCRIMINAION**

126.    Plaintiff incorporates by reference the preceding allegations and makes them a part hereof as if fully set forth herein.

127.    Defendant discriminated against Plaintiff because of her gender (female) in violation of Title VII of the Civil Rights Act of 1964, as amended, by forcing her to resign from the position of Fiscal Research Division Director and not allowing her to transfer to another position at the General Assembly.

128.     Defendant treated Plaintiff disparately because she belongs simultaneously to two
protected classes:  1) African-American, 2) Female (intersectional discrimination).

129.     Defendant held Plaintiff to a higher performance standard than her white male
colleagues.

130.     Defendant held Plaintiff to a performance standard that was determined by her race
and/or her gender and that was unrelated to the functions of her position.

131.     Plaintiff was replaced by white males.

132.     Plaintiff was at least as well-qualified for the job as the white males who replaced her.

133.     Defendant has offered reasons for forcing Plaintiff to resign that were false and
pretextual.

134.     Defendant's gender discrimination was intentional.

### THIRD CAUSE OF ACTION: IN THE ALTERNATIVE, RACE AND/OR GENDER DISCRIMINATION IN VIOLATION OF GERA

135.     Plaintiff incorporates by reference the preceding allegations and makes them a part hereof
as if fully set forth herein.

136.     In the event the Court determines that Plaintiff was not an "employee" under Title VII,
Plaintiff was an exempt State employee covered by 42 U.S.C. § 2000e-16c of GERA.

137.     Pursuant to 29 CFR § 1603.102, if Plaintiff is covered by GERA, her Charge of
Discrimination must be processed by the EEOC as a complaint under the GERA federal
regulations and relates back to the filing of the initial Charge.

138.     Defendant held Plaintiff to a higher performance standard than her white male
colleagues.

139.     Defendant held Plaintiff to a performance standard that was determined by her race and/or her gender and that was unrelated to the functions of her position.

140.     Defendant discriminated against Plaintiff because of her race and/or gender in violation of 42 U.S.C. § 2000e-16b by forcing her to resign from the position of Director of the Fiscal Research Division and not allowing her the opportunity to transfer to another position at the General Assembly.

141.     Defendant's race and/or gender discrimination was intentional.

142.     Defendant treated Plaintiff disparately from her white male colleagues because of her race and/or because she belongs to two protected classes as an African-American female.

143.     Plaintiff therefore asserts, in the alternative, this Third Cause of Action for race and/or gender discrimination in the event that she is covered by GERA but not Title VII.

144.     In the event the Court determines that Plaintiff is not covered by Title VII, but is instead covered by GERA, Plaintiff requests that the Court remand her GERA claims to the EEOC so that her Charge of Discrimination may be processed as a complaint under GERA and referred to an administrative law judge for a hearing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

(1)     Reinstate Plaintiff to the position of Director of the Fiscal Research Division with appropriate increases in her salary and reinstate her lost benefits, including but not limited to her retirement and health insurance benefits.

(2)     Award Plaintiff back pay with interest and make Plaintiff whole for the loss she has suffered as a result of the discrimination against her as alleged in this Amended Complaint.

19

(2)     Order the Defendant to remove from Plaintiff's personnel files and any other files any
negative references pertaining to Plaintiff, including but not limited to references to her
racial and gender discrimination complaint.

(3)     Take other appropriate measures to overcome the effects of discrimination.

(4)     Award compensatory damages to Plaintiff for mental and/or physical injuries incurred as
a result of the discrimination against her as alleged in this Amended Complaint, pursuant
to and within the statutory limitations of 42 U.S.C. § 1981a.

(5)     Award the Reasonable attorney's fees and costs incurred in this action.

(6)     In the alternative, if Plaintiff was not an "employee" under Title VII, Plaintiff requests
that this action be remanded to the EEOC so that she may proceed with her GERA claims
under the provisions of 42 U.S.C. § 2000e-16a, et seq. and 29 CFR §1603.101, et seq.

(7)     Provide such other and further relief as justice may require.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the
Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §
1981a.

This the 8th day of December, 2015.

/s/Stewart W. Fisher
Stewart W. Fisher (N.C. Bar No. 10327)
Carlos E. Mahoney (N.C. Bar No. 26509)
GLENN, MILLS, FISHER & MAHONEY, P.A.
404 Hunt Street, Suite 100
P.O. Box 3865
Durham, North Carolina 27702
Telephone: (919-683-2135)
Facsimile: (919-688-9339)
E-Mail: sfisher@gmfm-law.com
cmahoney@gmfm-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing AMENDED COMPLAINT was filed

Electronically with the Clerk of court using the CM/ECF system, which will send notification of

such filing to the following persons:

Lars F. Nance
Special Deputy Attorney General
N.C. Department of Justice
114 West Edenton Street
P.O. Box 629
Raleigh, North Carolina  27602-0629
E-Mail:  lfnance@ncdoj.gov

Charles G. Whitehead
Special Deputy Attorney General
N.C. Department of Justice
114 West Edenton Street
P.O. Box 629
Raleigh, North Carolina  27602-0629
E-Mail:  cwhitehead@ncdoj.gov

This the 8th day of December, 2015.

/s/Stewart W. Fisher
Stewart W. Fisher (N.C. Bar No. 10327)
GLENN, MILLS, FISHER & MAHONEY, P.A.
404 Hunt Street, Suite 100
P.O. Box 3865
Durham, North Carolina  27702
Telephone:  (919-683-2135)
Facsimile:  (919-688-9339)
E-Mail:  sfisher@gmfm-law.com

21